UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

FILED

MAR - 1 2017

CLERK

| UNITED STATES OF AMERICA, | 3:16-CR-30164-MAM |
|---|---|
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS |
| MARWAN SADEKNI, | |
| Defendant. | |

Marwan Sadekni ("Sadekni"), a non-Indian, has moved to dismiss the criminal charges lodged against him – for allegedly assaulting another non-Indian in an Indian Health Services ("IHS") facility located on an Indian reservation[1] and leased to the United States. The dispositive question is whether the facility falls within the federal government's territorial jurisdiction. Because it does, the Court has subject matter jurisdiction over this case and Sadekni's dismissal motion must be denied.

## BACKGROUND

The IHS facility is situated on 155 acres of land located in Rosebud, Todd County, South Dakota, and is within the exterior boundaries of the Rosebud Sioux

---

[1] *Indian reservation*, Black's Law Dictionary (10th ed. 2014) ("An area that the federal government has designated for use by an American Indian tribe, where the tribe generally settles and establishes a tribal government.").

Indian Reservation.   The United States owns the land but holds it in trust for the Rosebud Sioux Tribe.   On August 1, 1988, a representative of the Secretary of the Department of Interior ("DOI"), acting on behalf of the Tribe, entered into a lease agreement with IHS, an agency of the Department of Health and Human Services ("DHHS"), for the purpose of operating a new comprehensive healthcare facility and associated living quarters on the land.   The lease incorporated a tribal resolution which approved the lease and building of the facility.   The lease was renewed in 2008, with the approval of the Tribe and the Bureau of Indian Affairs ("BIA"), for another 20 years.

Sadekni is a medical doctor who was assigned to the Rosebud IHS facility for several weeks in 2015.   Michelle Knepper is a physician assistant who worked as an independent contractor with the BIA at the facility during the same time period.   Both Sadekni and Knepper are non-Indians.

In January, 2015, while working a shift together at the hospital portion of the facility, Sadekni supposedly "yanked" Knepper by the neck and shook her after she placed a lab order that upset him.   Then about a month later, while working together at the hospital, Sadekni again became unnerved at Knepper – this time for ordering a CT scan and arranging a transport of one of his patients without his permission – and reputedly shoved her against the wall, grabbed her by the neck and began to choke her.

Ultimately, Sadekni was indicted and charged with two counts of assault by striking, beating and wounding in violation of 18 U.S.C. §§7 and 113(a)(4).   He later moved to dismiss the Indictment, insisting that the United States lacked jurisdiction and

2

that he could not be prosecuted in federal court because the State of South Dakota had

exclusive jurisdiction over the matter.

## DISCUSSION

### A. Reservation and Land History

The Rosebud Reservation was included as an undefined portion of the Louisiana

Purchase in 1803 and made up part of what was called the Louisiana Territory.[2]

Between 1851 and 1863, Indian tribes signed six treaties with the United States that

collectively accounted for all of the land in what is now South Dakota.[3] The Treaty of

Fort Laramie in 1851,[4] constituted a "cease of hostilities" agreement between Indian

tribes against each other and the United States.[5] The Treaty also etched tribal

boundaries and made the tribes responsible for depredations committed in their

territories.[6] The last of the six treaties, the Treaty of 1868,[7] created the "Great Sioux

---

[2]*See South Dakota - U.S. States – HISTORY.com,* http://www.history.com/topics/us-states/south-dakota; *History of the Louisiana Purchase from Barrister's Gallery,* http://www.barristersgallery.com/historylp.html; *see also Louisiana Purchase/HistoryNet,* http://www.historynet.com/louisiana-purchase.

[3]*See* 2 Charles J. Kappler, *Indian Affairs, Laws & Treaties* (1904) (collecting treaties); *see also* Siegfried Wiesner, *American Indian Treaties and Modern International Law,* 569-80 (1995); 1 Francis Paul Prucha, *The Great Father: The United States Government and the American Indians,* 446-500 (1984).

[4]*See* Treaty of Fort Laramie with Sioux, etc., 1851, Sept. 17, 1851, 11 Stat. 749.

[5]*See Bennett County, S.D. v. United States,* 394 F.2d 8, 10 (8th Cir. 1968).

[6]*See id.*

3

Reservation" which paved the way for the minting of the Rosebud Reservation two decades later.[8]  By the terms of the Treaty, lands were set aside "for the absolute and undisturbed use and occupation of the Indians."[9]   The federal government guaranteed that no persons would be allowed to pass through or settle on these lands.[10]  In return for government benefits, the Sioux gave up claims or rights in lands outside of the Reservation.[11]

A trilogy of acts diminished the boundaries of the Rosebud Reservation[12] but all of the Todd County Reservation land remained unaffected by post-statehood enactments.[13]  Since 1988, the IHS facility and its hospital have occupied Reservation land in the County.[14]

---

[7]Treaty with the Sioux – Brule Oglala, Miniconjou, Yanktonai Hunkpata, Black Feet, Cuthead, Two Kettle, Sans Arcs, and Santee – and Arapaho, 1868, April 29, 1868, 15 Stat. 635.

[8]*See Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 589 (1977); *Bennett County,* 394 F.2d at 10.

[9]*Bennett County,* 394 F.2d at 10 (*quoting* the Treaty).

[10]*See id.*

[11]*See id.*

[12]*See Kneip,* 430 U.S. at 587-88.

[13]*See id.* at 589.

[14]*See* Docket No. 35, Attach. (Lease) at 1.

The establishment of the State of South Dakota occurred about the same time as, but distinctly from, the spawning of the Rosebud Reservation. The 1861 Organic Act carved out the Dakota Territory, which included North and South Dakota, Montana, Wyoming and a small part of Nebraska.[15] By 1868, this territory was pared down and consisted of only what are North and South Dakota today.[16] In 1889, the territory was divided into the States of North and South Dakota.[17] That same year, the United States passed the Enabling Act[18] which allowed South Dakota to be admitted as a state upon ratification of a state constitution.[19] Nine months later, the State formally became a member of the Union.[20]

In an abrupt change from its earlier policy of allotment and assimilation, Congress enacted the Indian Reorganization Act of 1934 (IRA)[21] which provided a mechanism for the federal government to acquire land in trust for the benefit of Indian

---

[15]*See* Act of March 2, 1861, ch. 86, 12 Stat. 239; *Territory ex rel Smith v. Scott*, 3 Dakota 357, 20 N.W. 401, 406 (1884).

[16]*See Dakota Territory Records – State Agencies – Archives State Historical Society of North Dakota*, http://www.history.nd.gov/archives/stateagencies/dtrecords.html

[17]*See id.*

[18]*See* Act of Feb. 22, 1889, ch. 180, 25 Stat. 676.

[19]*See Kanaly v. State by and through Janklow*, 368 N.W.2d 819, 821 (S.D. 1985).

[20]*See id.*

[21]*See* Act of June 18, 1934, ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. §§461, *et. seq.*)

tribes and to proclaim new reservations on lands so acquired.[22]   The IRA also encouraged tribes to adopt constitutions to govern their internal affairs and engage in economic development.[23]   In response to the enactment of IRA, the Rosebud Tribe adopted its own Constitution and Bylaws which DOI approved in 1935.[24]  Article VIII of the Constitution authorized the federal government to take all non-allotted lands into trust and hold them on behalf of the Tribe.[25]   The acreage the IHS facility and its hospital were built on is government owned trust land and has been, and continues to be, used by federal agencies with the Tribe and BIA's approval.[26]

At no point in its history, has South Dakota ever had any possessory interest, or exercised jurisdiction over, the Indian land[27] where the IHS facility is situated.[28]  This is because of the supremacy of the United States in matters involving such land.[29]

---

[22]*See Citizens Against Casino Gambling in Erie County v. Hogen,* No. 07-CV-0451S, 2008 WL 2746566 at *8 (W.D.N.Y. July 8, 2008).

[23]*See id.*

[24]*See* Docket No. 41, Attach. at 1, 3-12.

[25]*See id.* at 7-8.

[26]*See* Docket No. 43, Attach. (BIA Tract History Report).

[27]*Indian land,* Black's Law Dictionary ("Land owned by the United States but held in trust for and used by American Indians.").

[28]*See Estate of Ducheneaux v. Ducheneaux,* 2015 S.D. 11, ¶¶9-12, 861 N.W.2d 519, 522-24.

[29]*See id.,* 2015 S.D. 11, ¶¶10-11, 861 N.W.2d at 822-23; *see also* S.D. Const. art. XXII, subd. 2; *id.,* art. XXVI, §18.

## B. Territorial Jurisdiction Statute

By its terms, §113(a)(4) requires that the assault occur "within the special maritime and territorial jurisdiction of the United States." This realm of special jurisdiction includes:

> Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.[30]

The primary source of §7(3) is the "Enclave" Clause of the United States Constitution.[31]

### 1. Legislative History

Although in its present form, §7(3) dates to 1940, the statute can be traced back to several provisions of an act passed by the first Congress entitled "An Act for the Punishment of certain Crimes against the United States" ("1790 Act").[32] The 1790 Act did not have a marked jurisdictional provision (like §7), but instead incorporated the jurisdictional limits of federal courts separately into the substantive definition of each

---

[30]18 U.S.C. §7(3).

[31]*See* U.S. Const. art. I, §8, cl. 17 ("The Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia] as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings . . . .").

[32]Act of April 30, 1790, ch. 9, 1 Stat. 112.

offense.[33]  Section 3 of that Act, for example, provided "[t]hat if any person . . . shall, with any fort, arsenal, dock-yard, magazine, or in any other place or district of country, under the sole and exclusive jurisdiction of the United States, commit the crime of wilful murder, such person . . . shall suffer death."[34]  The jurisdictional language of the Act was clearly based on and came from the Enclave Clause.[35]

The 1790 Act was codified and slightly amended in 1874,[36] but remained essentially unchanged until 1909, when Congress passed "An Act To codify, revise and amend the penal laws of the United States" ("1909 Act").[37]  The 1909 Act sweepingly codified all existing federal criminal law, including the offense of assault by striking, beating and wounding.[38]  And in the Act, Congress unveiled a separate and distinct section on jurisdiction.  That section, provided that the territorial jurisdiction of the United States included:

---

[33]*See United States v. Gatlin*, 216 F.3d 207, 216 (2d Cir. 2000).

[34]1790 Act, ch. IX, §3, 1 Stat. 113; *see also e.g., id.* §1 Stat. 113 (manslaughter); *id.* §13, 1 Stat. 115 (maiming); *id.* §16, 1 Stat. 116 (larceny).

[35]*See United States v. Guiteau*, 12 D.C. (1 Mackey) 498, 528 (1882) ("In designating the places in which the commission of murder should be deemed a crime against the United States, the legislature employed substantially, and to some extent, precisely the language found in [U.S. Const. art. I, §8, cl. 17] . . . .").

[36]*See* 70 Rev. Stat., ch. 3, §5339 (1874).

[37]Act of March 4, 1909, ch. 321, 35 Stat. 1088.

[38]*See id.* §276, 35 Stat. at 1143.

> Any lands reserved or acquired for the exclusive use of the United States and under the exclusive jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, dock-yard and other needful building.[39]

The 1909 Act remained intact until 1940, when Congress amended the Act in two ways ("1940 Act").[40] First, the word "exclusive" was deleted from the initial phrase, so that jurisdiction no longer required that lands be reserved or acquired "for the exclusive use" of the United States.[41] Second, the words "or concurrent" were inserted between "exclusive" and "jurisdiction" in the succeeding phrase, so that jurisdiction extended to "any lands reserved or acquired for the use of the United States and under the exclusive or *concurrent* jurisdiction thereof."[42] Congress thus granted, for the first time, federal courts jurisdiction over crimes committed on lands that were not exclusively under the jurisdiction of the United States.

The House report concerning the 1940 Act unequivocally states that the amendments were prompted by the Supreme Court's decision in *James v. Dravo Contracting Co.*,[43] three years earlier, in which the Court held that the Enclave Clause

---

[39]*Id.* §272, 35 Stat. at 1143.

[40]*See* Act of June 11, 1940, ch. 323, 54 Stat. 304.

[41]*Id.*

[42]*Id.* (emphasis added).

[43]302 U.S. 134 (1937).

permitted states to retain partial or concurrent jurisdiction over land they consensually transferred to the United States.[44]   Congress believed that the holding in *Dravo* necessitated a revision to the 1909 Act because that Act "limited the criminal jurisdiction of the Federal Government to such Federal reservations in respect to which the United States had acquired exclusive jurisdiction."[45]   Hence, the purpose of the 1940 amendment was "simply [to] restore[ ] to the Federal Government the jurisdiction it was recognized as having until [the *Dravo* decision] was handed down."[46]

## 2. Current Version

Section 7(3) as it appeared in 2015 and still today, can best be understood if it is broken down into two parts.   The first part of the statute provides jurisdiction over "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof."   This part applies to lands generally, as opposed to a "place . . . . for the erection of a . . . building."   These lands must be ones the United States has "reserved or acquired."   This can be done without the consent of a state's legislature if the federal government reserved or acquired the lands before

---

[44]*See* H.R. Rep. No. 76-1623, at 1 (1940) ("Prior to the decision of the Supreme Court in [*Dravo*], it was the accepted view that the United States acquired exclusive jurisdiction over any lands purchased with the consent of the State, for any of the purposes enumerated in [the Enclave Clause] of the Constitution, and that any provision of a State statute retaining partial or concurrent jurisdiction was inoperable.")

[45]*Id.*

[46]*Id.*

10

statehood.[47]   Otherwise, §7(3) can only reach lands that are subject to the exclusive or concurrent jurisdiction of the United States via consent or cession.[48]

The statute's second part applies to any place the United States purchases or acquires by the consent of the legislature of a state for the purpose of a fort, magazine, arsenal, dockyard or other needful building.   Without the state's consent, the United States does not gain legislative jurisdiction.[49]   Consent is often given in the form of a state enactment.

Since 1940, Congress has required the United States to assent to the transfer of jurisdiction from a state regardless of how the land or property may have been acquired.[50]   Before then, the presumption was that the United States accepted jurisdiction, in the absence of evidence that showed otherwise, whenever it was offered.[51]

### 3. Reserved or Acquired for the Use of the United States

Section 7(3)'s "reserved or acquired for the use of the United States" clause has not been particularly controversial or difficult to apply.   Clarity in the words used in the

---

[47]See Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 526-527, 531-32 (1885).

[48]See United States v. Davis, 726 F.3d 357, 363 (2d Cir. 2013), cert. denied, 135 S.Ct. 48 (2014).

[49]See Dravo, 302 U.S. at 141-42.

[50]See 40 U.S.C. §3112 and its predecessor, 40 U.S.C.  §255.

[51]See Silas Mason Co. v. Tax Comm'n, 302 U.S. 186, 207 (1937); Lowe, 114 U.S. at 528.

statute has enabled courts to skip over them without much explication.[52]   Before

following suit here, it bears pointing out that the clause does not refer to a particular

interest the United States must have in the lands that are "reserved or acquired."[53]  Nor

does the clause require that the United States be an owner, or even an occupant, of the

lands in question, so long as they have been set aside for the use of an instrumentality

of the federal government.[54]

By this standard, there can be little doubt that the Rosebud IHS facility has been

acquired for the use of the United States.  The acreage upon which the facility is situated

has been Indian land – that the federal government and Rosebud Tribe have owned,

used and occupied – since well before South Dakota ever became a state.[55]

The United States, by and through DHHS and IHS, also leases the facility from

the Rosebud Tribe for the purpose of operating a full-service healthcare facility and

---

[52]*See United States v. Corey,* 232 F.3d 1166, 1176 (9th Cir. 2000), *cert. denied,* 534 U.S. 887 (2001); *United States v. Blunt,* 558 F.2d 1245, 1246 (6th Cir. 1977); *United States v. Erdos,* 474 F.2d 157, 159 (4th Cir.), *cert. denied,* 414 U.S. 876 (1973); *United States v. Morton,* 314 F.Supp.2d 509, 513 (D.Md. 2004); *United States v. Bin Laden,* 92 F. Supp.2d 189, 204-06 (S.D.N.Y. 2000); *United States v. King,* 781 F.Supp. 315, 317 (D.N.J. 1991); *Witten v. Pitman,* 613 F.Supp.63, 65-66 (S.D. Fla. 1985).

[53]*See Corey,* 232 F.3d at 177; *Blunt,* 558 F.2d at 1246-47.

[54]*See Corey,* 232 F.3d at 177.

[55]*See United States v. Sioux Nation of Indians,* 448 U.S. 371, 374-84, 407-24 (1980); *Kneip,* 430 U.S. at 589; *United States v. Sioux Tribe,* 222 Ct.Cl. 421, 425-31, *cert. denied,* 446 U.S. 953 (1980); *Sioux Tribe of Indians v. United States,* 97 Ct. Cl. 613, 616-57 (1942).

providing dwelling places for facility staff.[56]   The lease gives the BIA jurisdiction over

the premises and makes it responsible for the construction, maintenance, repair and

alteration of the facility.[57]  And the federal government, through two of its departments

and agencies (DOI, BIA, DHHS and IHS), has regulatory authority over the facility and

the land the same is affixed to.[58]

That the IHS facility is on lands "reserved or acquired for use of the United

States," within the meaning of §7(3), cannot reasonably be questioned.[59]  Sadekni does

not contest this and acknowledges that the first clause of the statute has been satisfied.[60]

## 4. "Exclusive or Concurrent Jurisdiction"

Consideration must next be given to whether the United States exercises

"exclusive or concurrent" jurisdiction over the IHS facility.  This is an exceedingly

complex question that requires one to meander through a labyrinth of legal and

historical interpretations to find an answer.

---

[56]*See* Docket No. 35, Attach.

[57]*See id.* at 3, ¶13.

[58]*See e.g.* 25 C.F.R. Parts 151, 152, 162, 900; 42 C.F.R. Parts 136, 136a.

[59]*See and compare United States v. Gleason*, Criminal No. 07-349-KI, 2009 WL 799645 at *3 (D. Or. March 24, 2009) (the Afghan training facility was not built to perform a solely American function such as provide office space or a residence to be used primarily by Americans).

[60]*See* Docket Nos. 26 at 2-3 and 42 at 1.

In general, there are four kinds of jurisdiction that exist on federal land: exclusive, concurrent, partial, and proprietary. "Exclusive jurisdiction" is the same as "exclusive legislation," at least as that term is used in the federal Enclave Clause,[61] and is present in situations in which the United States has received, by whatever method, all of the authority of a state, with no reservation made to the state except perhaps the right to serve process resulting from activities which occurred off the land.[62] "Concurrent legislative jurisdiction" applies where, in granting the federal government authority that would otherwise amount to exclusive legislative jurisdiction over a certain area, the state reserves to itself the right to exercise, concurrently with the government, all of the same authority.[63] With "proprietorial jurisdiction," the federal government has acquired some right of title to property in a state but has not obtained any measure of the state's authority over the same.[64] The United States though still has the power to subject a person – who commits a law violation in a federal building on the property – to federal proceedings (including criminal ones).[65]

---

[61]*See Surplus Trading Co. v. Cook*, 281 U.S. 647, 652 (1930).

[62]*See Study of Jurisdiction over Federal Areas within the States*, Part II at 10 (June 1957) (available at http://www.supremelaw.org/rsrc/fedjur/fedjur2.htm.).

[63]*See id.* at 11.

[64]*See id.*

[65]*See id.* at 11-12; *see also United States v. Stafford*, No. MJ-10-0013 GGH, 2010 WL 2218792 at *1, n.1 (E.D. Cal. June 1, 2010) ("a violation of federal law itself may be the subject of a federal criminal proceeding even in a place where the federal government

(continued...)

14

"Partial legislative jurisdiction" occurs when the United States has been granted some legislative jurisdiction over state territory, but the state reserves the right to exercise, by itself or concurrently with the federal government, other authority beyond the service of civil or criminal process in the territory (such as the right to tax property).[66]

Sadekni claims that he cannot be prosecuted in federal court for the two assault offenses because:

1. The United States never indicated that it accepted jurisdiction by filing the requisite notice with the Governor of South Dakota or in another manner prescribed by the state law; and

2. The offenses are alleged to have been committed by a non-Indian against a non-Indian on an Indian reservation which only the state, under the *McBratney/Draper* rule,[67] has criminal jurisdiction over.

Each of these claims will be discussed – in a framed perspective – below.

### a. State Disclaimer and Cession of Jurisdiction to the United States

The Congressional Enabling Act, permitting South Dakota to enter the Union, required that the State disclaim jurisdiction over Indian land:

[T]he people . . . do agree and declare that they *forever disclaim all right and title* to the unappropriated public lands lying within the boundaries thereof, and *to all lands lying within said limits owned or held by any Indian or*

---

exercises only proprietary jurisdiction, e.g., certain federal buildings").

[66]*See id.*

[67]*See United States v. McBratney*, 104 U.S. 621 (1881); *Draper v. United States*, 164 U.S. 240 (1896).

15

> *Indian tribes*; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and *said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States. . . .*[68]

The same Act stipulated that the ordinance adopted by the state constitution was to be "irrevocable without the consent of the United States and the people of [the state]."[69] The State later incorporated these provisions into its Constitution and they remain a part of the Constitution today.[70]

The United States has not expressly relinquished its jurisdiction over Indian lands within South Dakota – including the land where the IHS facility and hospital are embedded – or ceded jurisdiction of them to the State.[71] Nor has the State, by legislative

---

[68]Act of Feb. 22, 1889, ch. 180, §4, 25 Stat. 676 (emphasis added).

[69]*Id.*

[70]*See* S.D. Const. art. XXII; *id.*, art. XXVI, §18.

[71]*See Rosebud Sioux Tribe v. State*, 900 F.2d 1164, 1166-74 (8th Cir. 1990), *cert. denied*, 500 U.S. 915 (1991); *Beardslee v. United States*, 387 F.2d 280, 285-88 (8th Cir. 1967); *Kills Plenty v. United States*, 133 F.2d 292, 293-95 (8th Cir.), *cert. denied*, 319 U.S. 759 (1943); *United States v. Black Spotted Horse*, 282 F. 349, 351-54 (D.S.D. 1922); *State v. Cummings*, 2004 S.D. 56, ¶¶ 9, 15, 679 N.W.2d at 486-89, *cert. denied*, 543 U.S. 943 (2004); *id.*, 2004 S.D. 56, ¶25, 679 N.W.2d at 491 (Zinter, J. concurring); *State v. Vandermay*, 478 N.W.2d 289, 290-91 (S.D. 1991); *State v. Spotted Horse*, 462 N.W.2d 463, 466-67 (S.D. 1990), *cert. denied*, 500 U.S. 928 (1991); *Petition of High Pine*, 78 S.D. 121, 123-29, 99 N.W.2d 38, 39-42 (1959); *but see State ex rel Olson v. Schoemaker*, 73 S.D. 120, 121-30, 39 N.W.2d 524, 524-29 (1949).

enactment, consented to or assumed exclusive jurisdiction over these lands or any federal enclaves occupying them.[72]

### b. Acceptance

Before February 1, 1940, the United States's acceptance of jurisdiction over land that it acquired or owned was "presumed in the absence of any dissent on [the federal government's] part."[73]  On the date just mentioned, Congress passed 40 U.S.C. §255 (now 40 U.S.C. §3112) abrogating the rule of presumptive acceptance and substituting a notice procedure for authorized federal officials to expressly accept ceded jurisdiction.[74] The statute reversed the presumption of acceptance that had been in force by adding a new provision: "Unless and until the United States has accepted jurisdiction over the lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."[75]  The phrase, "hereafter to be acquired,"

---

[72]See id.

[73]Lowe, 114 U.S. at 528; see also Atkinson v. Tax Comm'n, 303 U.S. 20, 23 (1938); Davis, 726 F.3d at 363-64.

[74]See Act of Feb. 1, 1940, ch. 18, 54 Stat. 19.

[75]40 U.S.C. §255 (last paragraph and last sentence in it) (now 40 U.S.C. §3112(c)); see also Paul v. United States, 371 U.S. 245, 264 (1963) ("Since 1940 Congress has required the United States to assent to the transfer of jurisdiction over the property however it may be acquired."); Adams v. United States, 319 U.S. 312, 313-15 (1943) (holding that the federal government did not have jurisdiction under 18 U.S.C. §451 (now codified at 18 U.S.C. §7(3)), to try and sentence three soldiers for the rape of a civilian woman within the confines of a military camp because the government had failed to file the required notice of acceptance).

established, within the context of the statute itself, the existence of the earlier presumption of acceptance[76] and did not affect the federal government's previously acquired jurisdiction.[77]

Notably, it did not matter that the lands acquired were not fully developed until sometime after 1940 or that their intended purpose or use changed after then. Acceptance of jurisdiction was still presumed.[78]

Here, the United States (and the Rosebud Tribe) acquired the Indian land – that the IHS facility sits on – long before 1940 without expressing any declination of jurisdiction. It follows then that "[a]cceptance" may be presumed in the absence of evidence of a contrary intent."[79]  Given the pre-1940 presumption-of-acceptance rule then in place, the United States accepted jurisdiction when it acquired the land and no further affirmation was necessary.[80]

---

[76]See *United States v. Gabrion,* 517 F.3d 839, 850 (6th Cir. 2008), *cert. denied,* 556 U.S. 1168 (2009).

[77]See *United States v. Johnson,* 426 F.2d 1112, 1114-15 (7th Cir.), *cert. denied,* 400 U.S. 842 (1970); *Markham v. United States,* 215 U.S. 56, 58 (4th Cir. 1954), *cert. denied,* 348 U.S. 939 (1955); *United States v. Heard,* 270 F.Supp. 198, 200 (W.D. Mo. 1967).

[78]See *Humble Pipe Line Co. v. Waggonner,* 376 U.S. 369, 370-73 (1964); *Arlington Hotel Co. v. Fant,* 278 U.S. 439, 445-55 (1929); *Benson v. United States,* 146 U.S. 325, 329-31 (1892); *United States v. Redstone,* 488 F.2d 300, 302 (8th Cir. 1973); *Johnson,* 426 F.2d at 1114; *Markham,* 215 F.2d at 57-58; *United States v. Gilbert,* 94 F.Supp.2d 157, 160-61 (D. Mass. 2000); *Heard,* 270 F.Supp. at 199-201.

[79]*Silas Mason,* 302 U.S. at 207.

[80]See *Waggonner,* 376 U.S. at 371-74; *Davis,* 726 F.3d at 369; *Gabrion,* 517 F.3d at

(continued...)

### c. Practical Usage and Dominion or Regulatory Authority

Section 7(3) grants the United States jurisdiction over those territories over which it has "practical usage and dominion" or "regulatory authority."[81]  Under this standard, a court must consider whether the federal government "enjoys such control over the area that the law should constructively regard it as [federal] territory."[82]

Territorial jurisdiction, under §7(3), need not be exclusive.[83]  Two sovereigns may exercise concurrent jurisdiction when their relationship is regulated by law.[84]  The United States Constitution allows federal and state governments to exercise concurrent

---

848-49; *id*, 517 F.3d at 864-65 (Moore, J. concurring); *United States v. Cassidy*, 571 F.2d 534, 536-37 (10th Cir.), *cert. denied*, 436 U.S. 951 (1978); *Redstone*, 488 F.2d at 301-02; *Gilbert*, 94 F.Supp.2d at 161; *Markham*, 215 F.2d at 58; *see also United States v. Fields*, 516 F.3d 923, 935-36 (10th Cir. 2008) (territorial jurisdiction established because there was no evidence affirmatively negating the federal government's acceptance of land acquired from Oklahoma in 1931), *cert. denied*, 556 U.S. 1167 (2009).

[81]*See Corey*, 232 F.3d at 1178; *United States v. Booth*, 936 F.2d 573, 1991 WL 119530 at **5 (6th Cir. July 3, 1991), *cert. denied*, 502 U.S. 1049 (1992); *United States v. McCalvin*, 608 F.2d 1167, 1170 (8th Cir. 1979); *Erdos*, 474 F.2d at 159; *United States v. Holmes*, 699 F.Supp.2d 818, 830 (E.D. Va. 2010), *aff'd* 670 F.3d 586 (4th Cir.), *cert. denied*, 133 S.Ct. 426 (2012); *United States v. Straub*, No. CR-05-0029, 2005 WL 1155042 at *3 (M.D.Pa. May 4, 2005).

[82]*Corey*, 232 F.3d at 1178.

[83]*See id.*

[84]*See id.* at 1179; *United States v. Patton*, 651 Fed. Appx. 423, 424-25 (6th Cir.), *cert. denied*, 137 S.Ct. 259 (2016)

jurisdiction over certain matters with the Supremacy Clause usually – but not always – resolving any conflict in favor of the former over the latter.[85]

Indian reservations are a "typical illustration of lands the United States owns, not as federal enclaves, but rather as the trustee for the benefit of Indians. This ownership, without more, does not withdraw the lands from the jurisdiction of the state."[86] The Supreme Court has confirmed that Indian lands are not subject to the exclusive jurisdiction of the federal government.[87]

The United States asserts practical dominion over and regulates activities at the IHS facility and the hospital that makes up a part of it. Through laws passed by Congress, and corresponding agency rules promulgated to implement these laws, the federal government controls, funds and regulates the use of reservation-situated

---

[85] *See id.*

[86] *Surplus Trading Co. v. Cook*, 281 U.S. 647, 650-51 (1930).

[87] *See Nevada v. Hicks*, 533 U.S. 353, 361 (2001) ("Our cases make clear that the Indians'[s] right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border. Though tribes are often referred to as 'sovereign' entities, it was 'long ago' that 'the Court departed from Chief Justice Marshall's view that the laws of [a state] can have no force within reservation boundaries'") (*quoting Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 561 (1832)); *see also Surplus Trading Co.*, 281 U.S. at 651 (referring to the Indian reservation as an example of land owned by the United States that does not constitute a federal enclave because state civil and criminal laws still have partial application therein); *City of Roseville v. Norton*, 219 F.Supp.2d 130, 151 (D.D.C. 2002) ("land taken into trust for Indians does not create an exclusive federal enclave"), *aff'd,* 348 F.3d 1020 (D.C. Cir. 2003), *cert. denied,* 541 U.S. 974 (2004).

healthcare facilities such as the one in Rosebud.[88]  And the lease between the Rosebud Tribe and the IHS gives the BIA jurisdiction over the facility and the land it rests on.[89]

What's more, the 1940 revision to §7(3)'s predecessor provides additional support for the notion that the United States has at least concurrent jurisdiction over crimes committed within reservation IHS facilities.  The House Report explicitly states that "[t]he most significant effect of th[e] bill is to grant Federal courts concurrent criminal jurisdiction on reservations where the United States does not have exclusive jurisdiction."[90]  The Report appears to be saying that the federal government would henceforth be able to exercise legislative jurisdiction over acquired lands the states had retained concurrent jurisdiction over – just as it had been able to do for lands over which the states did not retain jurisdiction.

The United States's status as legal titleholder and trustee further buttresses the view that federal government has concurrent jurisdiction over the actions of healthcare providers in its own Indian hospital.  The government not only owns the IHS hospital but also is responsible for what goes on in the hospital, including the health, safety and welfare of those who work and are treated at the same.

_____

[88]*See e.g.*, 25 U.S.C. §§13, 1601, *et seq.*, 5321, 5322, 5324, 5325, 5388; 42 U.S.C. §§1396j, 2001 *et seq.*; 25 C.F.R. Parts 151, 152, 162, 900; 42 C.F.R. Parts 136, 136a.

[89]*See* Docket No. 35, Attach. at 1; *compare Gleason*, 2009 WL 799645 at *4 (no document to rely on to conclude that the United States exercised exclusive or concurrent jurisdiction over the training facility in Afghanistan).

[90]H.R. Rep. No. 76-1623 at 1.

All of this aside, for more than a century, there has been a shared jurisdictional scheme in place to accommodate the needs of concurrent authorities – the United States, states and Indian tribes – in Indian territory.[91] This scheme resembles, in many respects, the agreements the United States has worked out with other countries on foreign territories.[92]   Extraterritorial jurisdiction cases, decided under §7(3), while not dispositive, are nonetheless helpful and support federal and state criminal jurisdiction – especially in a case such as this one involving an IHS facility (the federal government has full use of and exercises dominion and regulatory control over) that is quartered on reservation land governed by an Indian tribe.[93]

---

[91]*See Corey,* 232 F.3d at 1174.

[92]*See id.*

[93]*See Corey,* 232 F.3d at 1174-76, 1178-83; *see also Erdos,* 474 F.2d at 160 (the United States had criminal jurisdiction under §7(3) to try one of its citizens for killing another in an overseas embassy that the federal government used and exerted dominion over ); *Holmes,* 699 F.Supp.2d at 829-30 (§7(3) creates jurisdiction for the United States to prosecute an American soldier for sexually assaulting his step-daughter at an Air Force base in Japan); *Witten,* 613 F.Supp. at 65-66 (federal government had special territorial jurisdiction over Florida resident who entered United States Customs area at the Nassau, Bahamas airport); *but see Gatlin,* 216 F.3d at 216 ("Congress intended §7(3) to apply only to lands within the territorial boundaries of the United States"), *abrogated in part by, United States v. Yousef,* 750 F.3d 254, 262 (2d Cir.), *cert. denied,* 135 S.Ct. 248 (2014); *Bin Laden,* 92 F.Supp.2d at 214-15 (holding that United States embassy premises in foreign countries are not included within §7(3)'s special territorial jurisdiction and that the federal government had no jurisdiction over murders committed on the premises).

### d. McBratney/Draper Rule

In *McBratney*, a non-Indian was convicted in federal court of murdering another non-Indian on a Colorado Indian reservation.[94]  In a highly suspect application of statutory construction,[95] the Supreme Court first observed that federal courts could only exercise criminal jurisdiction over places – including Indian country – within the exclusive jurisdiction of the United States.[96]  According to the Court, if Colorado had jurisdiction over the offense, then the federal government did not.[97]  Colorado had jurisdiction, the Court said, because Congress had admitted it to the Union "upon an equal footing with the original States" and no exception was made for jurisdiction over the reservation.[98]  Thus, the Court reasoned, Colorado law extended throughout the State, and to the reservation, insofar as that law related to non-Indian against non-Indian crimes.[99]

---

[94]*See* 104 U.S. at 621.

[95]*See Cohen's Handbook of Federal Indian Law*, §6.01[3] at 456, n. 54 (Nell Jessup Newton ed. 2012).

[96]*See McBratney*, 104 U.S. at 621-22.

[97]*See id.* at 623-24.

[98]*Id.*

[99]*See id.* at 624.

*McBratney's* holding was later shoehorned in *Draper*. There, the murder of a non-Indian by a non-Indian occurred on a Montana reservation. [100] The State's enabling act provided that the people of Montana "agree and declare that they forever disclaim" all title to Indian lands and that "said lands shall remain under the absolute jurisdiction and control of the Congress of the United States."[101] In the face of this language, the Supreme Court ruled that the State, and not the federal government, had jurisdiction over the homicide.[102]

Despite what commentators believe to be untenable underpinnings,[103] *McBratney* and *Draper* are, and remain, the accepted rule of law.[104] *Draper's* rebuffing of the

---

[100]*See* 164 U.S. at 24.

[101]*Id.* at 244.

[102]*See id.* at 245-47.

[103]*See Cohen's Handbook of Federal Indian Law*, §6.01[3] at 496-97 & nn. 54-57, §9.03 at 763 & n.8.

[104]*See e.g. United States v. Wheeler*, 435 U.S. 313, 324, n.21 (1978); *United States v. Antelope*, 430 U.S. 641, 644, n. 4 (1977); *New York ex rel Ray v. Martin*, 326 U.S. 496, 500 (1946); *United States v. Graham*, 572 F.3d 954, 957 (8th Cir. 2009); *United States v. Norquay*, 905 F.2d 1157, 1162 (8th Cir. 1990); *United States v. Dodge*, 538 F.2d 770, 775-76 (8th Cir. 1976), *cert. denied*, 429 U.S. 1099 (1977); *see also United States v. Langford*, 641 F.3d 1195, 1197-99 (10th Cir. 2011) ("The Supreme Court has consistently reaffirmed the 'equal footing' holding of *McBratney*." And with respect to Indian country crimes involving non-Indians, "longstanding precedents of th[e] Court hold that state courts have exclusive jurisdiction. . . ."); *William C. Canby, Jr., American Indian Law in a Nutshell* at pp. 199-200 (6th ed. 2015) (even though non-Indian against non-Indian crimes appear to fall within the federal jurisdiction conferred by 18 U.S.C. §1152, the Supreme Court has continued to adhere to the *McBratney/Draper* rule and justified the results on the ground that Indians were not directly affected).

24

jurisdictional provisions contained in Montana's enabling act is still valid as precedent. Strikingly, the Supreme Court has gone on to explain that a state's disclaimer is proprietary, and not jurisdictional, and that the phrase "absolute jurisdiction and control" does not invariably mean "exclusive" federal jurisdiction.[105]

Several federal courts though have ruled that the *McBratney/Draper* rule is inapplicable to Indian lands in South Dakota – and to those on the Rosebud Reservation – based on the jurisdictional agreement the State and federal government entered into and put in place. Although not new cases, the rulings are nevertheless informative – particularly as to the issue of federal jurisdiction over offenses perpetrated by one non-Indian against another, in an enclave-like facility (the Rosebud IHS hospital) lodged on ceded South Dakota reservation land.

The first is an Eighth Circuit case decided in 1906.[106] In that case, the Court of Appeals held that South Dakota had, by consent of its people, ceded criminal jurisdiction over Indian land on the Rosebud and other reservations within the State which the United States had acquired before statehood.[107] The Court said that the consent and cession of jurisdiction, on the part of the State, and the federal

---

[105] *See Organized Village of Kake v. Egan,* 369 U.S. 60, 68-75 (1962).

[106] *See Hollister v. United States,* 145 F. 773 (8th Cir. 1906).

[107] *See id.* at 778.

25

government's assumption of the same, were sufficiently expressed in state constitutional provisions and state and federal enactments.[108]

A few months afterward, the Eighth Circuit Court of Appeals specifically addressed the *McBratney/Draper* rule, concluding that it only applied to crimes committed "in a sovereign state, the admission of which into the Union, without any exception with respect to the Indian reservations therein or the jurisdiction over them, removed those reservations from the plenary authority of the United States."[109]   The Appeals Court also cited with approval the case just mentioned, pointing out that the case "related to a crime [larceny] committed in an Indian reservation [Rosebud] in South Dakota, jurisdiction to punish which had been completely ceded to the United States by the state and accepted by Congress before its commission."[110]

Fast forward to 1922.  In that year, a federal district court in South Dakota determined that jurisdiction over crimes committed within the boundaries of the Rosebud Reservation had been ceded to and assumed by the United States.[111]  Federal

---

[108]*See id.*

[109]*Brown v. United States*, 146 F. 975, 977 (8th Cir. 1906).

[110]*Id.*

[111]*See United States v. Black Spotted Horse*, 282 F. 349, 351-54 (D.S.D. 1922).

jurisdiction applied to the entire Reservation, the court declared, even though the federal government's title to certain Reservation tracts had already been extinguished.[112]

In an ensuing federal appellate case, a man, who had been convicted of murder that occurred on the Rosebud Reservation, sought habeas relief on the ground that the federal district court in South Dakota had no jurisdiction to sentence him.[113] The Tenth Circuit Court of Appeals determined that the district court had jurisdiction over the crime and denied the writ.[114]

The Eighth Circuit Appeals Court later followed, in step, the preceding cases and held that it was the intention of South Dakota, in 1901, to cede to the United States jurisdiction over certain criminal offenses committed within the territorial limits of State Indian reservations so long as they remained reservations.[115] The Court further held that it was the intention of the federal government, in 1903 and thereafter, to assume and exercise that jurisdiction with respect to assault and other specifically enumerated offenses.[116]

---

[112]*See id.*

[113]*See Hatten v. Hudspeth*, 99 F.2d 501, 501-02 (10th Cir. 1938).

[114]*See id.* at 502-03.

[115]*See Kills Plenty*, 133 F.2d at 295.

[116]*See id.*

The South Dakota Supreme Court then ruled that the 1948 revisions Congress made to 18 U.S.C. §§1151, 1152 and 1153 served to deprive the United States of jurisdiction over offenses committed by non-Indians against non-Indians on Indian reservations and to restore such jurisdiction to the courts of South Dakota as in other states.[117]  In the Court's view, the legislative history, subject matter and revisers notes evidenced Congress' intention, in these revisions, to restore to South Dakota the power it had previously and to adopt a uniform policy of dealing with crime throughout Indian reservations.[118]

So does this mean that South Dakota has exclusive jurisdiction over Sadekni's assault case under the *McBratney/Draper* rule and the Supreme Court of South Dakota's decision? The short answer is "no".

Importantly, neither *McBratney, Draper* nor any other United States Supreme Court case after them involved offenses committed in a federal, reservation-situated, healthcare facility that provided treatment and care for Indians and otherwise directly affected their lives.[119]  The same is true of lower federal court cases and even state (including South Dakota) cases.  And no authority (the Court can find) exists that says,

---

[117]*See Shoemaker*, 73 S.D. at 124-27, 39 N.W.2d at 526-28.

[118]*See id.* at 73 S.D. at 126, 39 N.W.2d at 527.

[119]*See and compare Martin*, 326 U.S. at 500 (*McBratney* applies to crimes between non-Indians "which do not affect Indians").

or at least gives clear guidance as to whether, the *McBratney/Draper* rule extends to non-Indian crimes that take place in an IHS hospital on Indian land.

Equally important is the fact that *McBratney* and its offspring did not deal with the reach of the United States' territorial jurisdiction under §7(3). Nor did they shed any definitive light on whether a state's criminal jurisdiction over non-Indian against non-Indian reservation offenses, committed in a federal medical facility for Indians, was exclusive or concurrent with the federal government.

Further, nothing in the 1948 or later revisions to §§1151-53 indicates that the United States intended to retrocede its criminal jurisdiction over IHS facilities that the federal government owns and operates on Indian land. Nor is there a clearly minced congressional desire to give the states exclusive, rather than concurrent, jurisdiction over offenses non-Indians commit against other non-Indians in these facilities. If the *McBratney/Draper* rule was intended to apply to Indian facilities that the United States owns, funds, and operates, then this should have been coined somewhere. It is hard to conclude that full, as opposed to partial, retrocession of criminal jurisdiction over a federal Indian healthcare facility was what Congress had in mind in the absence of categorical language saying so or some harbinger to that effect.

Regardless, the *McBratney/Draper* rule must be read in conjunction with the federal criminal jurisdiction statute.[120] This statute vests district courts with "original

---

[120]*See* 18 U.S.C. §3231.

jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."[121]  The Supreme Court has held that the statute confers "jurisdiction of the subject matter and, of course, of the persons charged."[122]  In the criminal context, the statute is all that is necessary to establish a court's power to hear a case charging federal offenses, whether or not the offenses prove to be beyond Congress's concern or authority to enact.[123]  Thus, consistent with Court's teachings on subject matter jurisdiction,[124] whether §113(a)(4) criminalizes Sadekni's acts – under §7(3) – is a merits question that does not implicate the power of a federal court to sit and render judgment in his case.[125]

Given (1) the unique attributes of Sadekni's case (including the fact that the alleged assaults occurred in a healthcare facility on Indian land), (2) the many questions that exist relating to congressional intent and the applicability of the *McBratney/Draper*

---

[121]*Id.*

[122]*United States v. Williams*, 341 U.S. 58, 66 (1951); *see also Hugi v. United States*, 164 F.3d 378, 380 (7th Cir. 1999) (§3231 is "the beginning and the end of the 'jurisdictional inquiry'").

[123]*See Yousef*, 750 F.3d at 262.

[124]*See id.* at 259-62.

[125]*See id.* at 262; *see also United States v. Cotton*, 535 U.S. 625, 630-31 (2002) ("a district court 'has jurisdiction of all crimes cognizable under the authority of the United States. . . [and] [t]he objection that the indictment does not charge a crime against the United States goes only to the merits of the case'" *quoting Lamar v. United States*, 240 U.S. 60, 65 (1916)).

rule to offenses committed within the Rosebud IHS hospital, and (3) the effect of the federal criminal jurisdiction statute, it cannot be said, with any modicum of certainty, that the United States lacks subject-matter jurisdiction. South Dakota, indisputably, has jurisdiction over the case; and so does the federal government. That jurisdiction is concurrent and authority both sovereigns share with each other.

## 5. "Purchased or Otherwise Acquired . . . by Consent"

As far as the third clause of §7(3) is concerned, it appears that the federal government's acquisition, title, possession and leasing of the property at issue satisfies the "otherwise acquired" part of the clause. But the second part of the clause – that requires acquisition by consent of the South Dakota Legislature for the erection of a "needful building" – does not look as if it has been met. The United States has not brought to the Court's attention any legislative enactments or statements that show the State ever gave the federal government consent to acquire land in Rosebud for the purpose of constructing a comprehensive healthcare facility and housing units for it. If there was consent (even a latent accedence) to this, then it would have been given after 1940 and without the required acceptance.[126] This being the case, §7(3)'s last clause cannot provide a basis for federal criminal jurisdiction over the penal violations Sadekni is professed to have committed within the IHS hospital in Rosebud.

---

[126]*See* 40 U.S.C. §255 (now 40 U.S.C. §3112); *Adams*, 319 U.S. at 313-15; *King*, 781 F.Supp. at 318-19.

31

## C. Property Clause

During oral argument held on Sadekni's dismissal motion, the Court raised the ancillary issue of whether there was inherent federal jurisdiction, under the Property Clause,[127] that empowered the United States to regulate violent conduct within the bounds of an IHS hospital stationed on Indian land.   Having now studied the issue more closely and in greater depth, the Court concludes that the Clause does not apply and provide authority for the filing and pursuit of criminal charges, arising out of such conduct, in a federal forum.

Although the "furthest reaches" of the Property Clause "have not yet been definitively resolved," the Clause appears to be limited to "public lands" and conduct that affects them.[128]   But it has long been established that Indian land is not public land.[129]  This is because of the "reservation status" of such land, the manner in which it is held and the restrictions on its use and alienability.[130]  These attributes take Indian land out of the intended sphere and grasp of the Clause.[131]

---

[127]*See* U.S. Const. art. IV, §3, cl. 2.

[128]*Kleppe v. New Mexico*, 426 U.S. 529, 536-46 (1976).

[129]*See Sioux Tribe of Indians v. United States*, 316 U.S. 317, 235-36 (1942); *Minnesota v. Hitchcock*, 185 U.S. 373, 395-402 (1902); *Leavenworth L. & G.R. Co. v. United States*, 92 U.S. 733, 746-47 (1875); *United States v. Schwarz*, 460 F.2d 1365, 1372 (7th Cir. 1972); *Bennett County*, 394 F.2d at 11; *Putnam v. United States*, 248 F.2d 292, 294-95 (8th Cir. 1957); *United States v. McIntire*, 101 F.2d 650, 654 (9th Cir. 1939).

[130]*See generally, American Indian Law Deskbook*, §2:12 at pp. 120-25 (2016 ed.); *American Indian Law in a Nutshell*, ch. 12, §F at pp. 442-44; *Cohen's American Indian Law,*
(continued...)

Significantly, no court to date has ever used the Clause as a foundation for a prosecution with a fact pattern like this one or, for that matter, one involving criminal conduct that has occurred in any federally-run facility rooted on Indian land.  The closest courts have come has been in situations where the offenses were committed in an off-reservation national park, forest or recreation area,[132] nuclear facility,[133] postal property,[134] or building owned by an institution receiving federal financial assistance.[135]

At any rate, in those cases resulting in federal convictions that were upheld on appeal, the crimes were Property Clause-based.[136]   Sadekni's crimes are not derived

---

§§15.02-03 at pp. 995-99.

[131]*See King,* 781 F.Supp. at 319 & n.3.

[132]*See e.g. United States v. Bohn,* 622 F.3d 1129, 1134-35 (9th Cir. 2010); *Gabrion,* 517 F.3d at 846-48, 859, 862-63; *United States v. Brown,* 552 F.2d 817, 821-22 (8th Cir.), *cert. denied,* 431 U.S. 949 (1977); *United States v. Bundy,* 3:16-cr-00051-BR, 2016 WL 5340303 at *3 (D. Or. Sept. 21, 2016); *United States v. Farrell,* No. CR 07-0174 MAG, 2007 WL 2348751 at **2-3 (N.D. Cal. Aug. 14, 2007); *United States v. Thompson,* 41 F.Supp. 13, 14-15 (E.D. Wash. 1941).

[133]*See e.g. United States v. Seward,* 687 F.2d 1270, 1277 (10th Cir. 1982), *cert. denied,* 459 U.S. 1147 (1983).

[134]*See e.g. United States v. Gliatta,* 580 F.2d 156, 160 (5th Cir.), *cert. denied,* 439 U.S. 1048 (1978).

[135]*See e.g. United States v. Hersom,* 588 F.3d 60, 61-63 (1st Cir. 2009).

[136]*See e.g. Bohn,* 622 F.3d at 1135; *Hersom,* 588 F.3d at 62; *Gliatta,* 580 F.2d at 160; *Brown,* 552 F.2d at 822; *Farrell,* 2007 WL 2348751 at *3; *but see United States v. Elk Shoulder,* 738 F.3d 948, 952, 959 (9th Cir. 2013), *cert. denied,* 134 S.Ct. 1920 (2014) (the Property and Necessary and Proper Clauses gave Congress the power and authority to enact defendant's crime of conviction, sexual contact with a minor in violation of 18 U.S.C. §2241(c)).

from this Clause.  Where the Clause is not the source for the charged offenses, inherent jurisdiction – empowering the United States to regulate its own properly under federal law – is lacking and there must be some other linchpin to support the prosecution.[137]

For all of these reasons, the Property Clause cannot serve as a jurisdictional anchor for the indicted offenses.  The charges brought against Sadekni then can only stand, and be pursued, under the territorial jurisdictional "hook" of §7(3).

## CONCLUSION

The United States has concurrent jurisdiction, with South Dakota, to prosecute Sadekni for the assaults he allegedly committed in the Rosebud IHS hospital two years ago.  The pertinent history, the language and plain meaning of legislative enactments and constitutional provisions, the agreements and arrangements entered into and put in place, and the practical realities of the situation call for federal jurisdiction that is coextensive with that of the State.[138]  So too do the various nuances and tensions that exist in the law – statutory, constitutional and judge made – and the extent to which they apply to these novel circumstances.  To hold that the State's jurisdiction is exclusive would (1) limit, or at least partially strip, the United States of its regulatory authority on and within the property it owns, uses and has control over, (2) turn a blind eye to  what was consented to, disclaimed, ceded, and done in the past, (3) directly

---

[137]*See King*, 781 F.Supp. at 319 & n.3.

[138]*See Corey*, 232 F.3d at 1183.

impact reservation Indians and their right – based on the federal government's trust responsibility – to receive essential health services,[139] and (4) unnecessarily expand the scope and breath of the *McBratney/Draper* rule and other legal precedent.

What distinguishes Sadekni's case from the *McBratney* line of cases is the situs of the charged offenses. Neither *McBratney* nor any of the cases that have applied its holding involved crimes committed within the walls of a reservation-based critical care facility (like an IHS hospital) that the United States owns, funds, regulates, exercises dominion over, and is the trustee of – all for the benefit of an Indian tribe. Tellingly, Sadekni has not pointed to a single case in which *McBratney* has been relied on, that proscribes the assumption of federal criminal jurisdiction in the context of his case. Rather, he wants *McBratney* dilated to include crimes alleged to have occurred within the confines of a federal enclave-like hospital for Indians. Limiting the federal government's jurisdiction to this situation – an extraordinary and aberrant one – and

---

[139]*See* 25 U.S.C. §1602 (Congress declares that it is the policy of this Nation, in fulfillment of its special trust responsibilities and obligations to Indians . . . to ensure the highest possible health status for Indians . . . and to provide all resources necessary to effect that policy"); *White v. Califano*, 437 F.Supp. 543, 555 (D.S.D. 1977) ("Congress has unambiguously declared that the federal government has a legal responsibility to provide healthcare to Indians. This stems from the 'unique relationship' between Indians and the federal government, a relationship that is reflected in hundreds of cases and is further made obvious by the fact that one bulging volume of the U.S. Code pertains only to Indians."), *aff'd*, 581 F.2d 697 (8th Cir. 1977); *see also McNabb for McNabb v. Bowen*, 829 F.2d 787, 791-92 (9th Cir. 1987) (discussing the "overriding trust relationship between the federal government and the Indians" and congressional enactments relating to the same).

making it concurrent with state jurisdiction, avoids the "parade of horribles" suggested[140] and gives credence to *McBratney* and its bloodline without inflating the reach of them.  It also takes into account the various interests involved – federal, state and tribal – and both reconciles and harmonizes them in light of existing federal law.

The Court recognizes that if the United States is permitted to exercise jurisdiction over crimes committed within its own reservation-based hospital, then there will be dual (and maybe conflicting) enforcement of the same offense conduct by federal and state authorities.  But the fact that it might be a poor use of federal resources to duplicate something South Dakota is already able to do, or that it might be politically unwise to crack down on conduct the State chooses to ignore, does not mean that §7(3) withholds from the federal government the power to act.  Keep in mind that Indians, like bank robbers, firearm shooters and drug dealers, have had to deal with parallel risks (prosecution for the same acts in two different courts) for many years.  And no one disputes that the federal government would have criminal jurisdiction over Sadekni if he assaulted Knepper in one of the State Veteran's Administration hospitals instead of the Rosebud IHS hospital.[141]

---

[140]*See* Docket No. 42 at 6 (raising the specter that a ruling the United States has the authority to prosecute Sadekni "would open the door to Federal criminal jurisdiction over non-Indian crimes on *any land that is trust land*.").

[141]*See State v. Cochran*, 297 N.W.2d 483, 485-87 (S.D. 1980).

36

Congress intended, through §7(3), to stretch the contours of the federal criminal laws as far as the federal government's dominion could reach.  This included penal acts carried out by one non-Indian against another in a federal healthcare facility ensconced on Indian land.[142]  Because the IHS hospital in Rosebud falls within the "special . . . territorial jurisdiction of the United States" this Court, and any District Court in South Dakota, has concurrent jurisdiction to hear and preside over Sadekni's assault offenses.

There being federal subject matter jurisdiction over the two indicted crimes, Sadekni's Motion, seeking dismissal of the case on jurisdictional grounds,[143] shall be and is DENIED.

Dated this 1st day of March, 2017.


BY THE COURT:


**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**


---

[142]*See United States v. Consolidated Wounded Knee Cases,* 389 F.Supp. 235, 244 (D.S.D. 1975) ("[Federal] criminal laws apply to non-Indian citizens of the United States while on Indian reservations.  [T]he United States Congress has authority to make criminal laws binding its citizens while in [an Indian] nation. . . .").

[143]*See* Docket No. 25.